# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 30, 2008

## STATE OF TENNESSEE v. ROBERT CASH

### Appeal from the Criminal Court for Bradley County
### No. 05-558     Amy A. Reedy, Judge

### No. E2007-00720-CCA-R3-CD - Filed May 2, 2008

The defendant, Robert Cash, appeals his Bradley County Criminal Court conviction of one charge of aggravated sexual battery of a person under the age of thirteen, alleging that there was insufficient evidence to prove intent. We find that the evidence presented at trial was sufficient and affirm the judgment of the trial court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Sean G. Williams, Assistant District Public Defender (at trial); and Richard Hughes, District Public Defender (on appeal), for the appellant, Robert Cash.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; and Andrew M. Freiberg and John Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On October 26, 2005, the Bradley County Grand Jury indicted the defendant on one charge of aggravated sexual battery of a person under the age of thirteen, a Class B felony. *See* T.C.A. 39-13-504(a) (4) (2003). A jury convicted the defendant of the charge on July 26, 2006, and on December 1, 2006, the trial court sentenced the defendant to serve eight years at 100 percent in the Department of Correction.

At the trial, the victim, L.C.[1], testified that she knew the difference between right and wrong, as well as the importance of telling the truth in court. She stated she was then seven years old and was six at the time of the incident. She knew the defendant's family and was a friend of the

---

[1]It is the policy of this court to refer to victims of sexual crimes by their initials.

defendant's daughter, L., who was around her age. She testified that the offense occurred on August 14, 2005, when she and L. spent the night at the defendant's home. The two girls were asleep in the defendant's bed, and when they went to bed the defendant and his wife were on the couch in a different room.

L.C. testified that the defendant came in the bedroom "three or four" times that night. She said, when he first entered the bedroom, the defendant did not do or say anything to her. The second time "he asked me if I wanted him to do it . . . . He, he just asked me if he, if I wanted him to rub on my private area." She refused, but the defendant did it anyway. "He like rubbed on my private [with his hand] and he was kissing me with his tongue all at the same time. . . . He just said, 'How does that feel?' and 'This will be our little secret.'" L.C. said that the defendant was rubbing on top of the clothes she wore to bed, a shirt and panties. The kissing was on her neck. L.C. could not say how long the incident lasted.

L.C. testified that she did not know if L. was awake when the incident took place. She thought the defendant was awake during the incident because she "saw his eyes open." She thought the defendant's wife remained on the couch during the offense because the bedroom door was open when the offense occurred, and "the TV was going and the kitchen light was still on." She testified that the defendant left the bed when his wife called him back into the other room, but he returned later to the bedroom and "just laid there." L.C. testified that she told her mother about the incident two days later.

L.C.'s mother, Michelle C., testified that her family had been friends with the defendant's family for "probably five or six years." Prior to the offense, the families would spend time together "about every weekend at least." She said that August 14, 2005, was the last time L.C. was at the defendant's home for a sleep over. Up to that point, she trusted the defendant with her daughter. Ms. C. testified that the following day L.C. was quiet but not unusually so. She said L.C. told her about the incident three days later. After she discussed what happened with her husband, they decided to go to the authorities.

Ms. C. testified that she and her husband took L.C. to Cleveland Community Hospital that evening for an examination. A police officer came to the hospital that evening and made a report. The officer told them not to confront the defendant. However, a few weeks later, Ms. C's husband confronted the defendant while their family was visiting the home of Jennifer Gibby at Bradley Place Apartments. The confrontation took place in the parking lot of the apartment complex when the defendant "just arrived" unannounced with his wife and daughter in the car with him. She testified that her husband told the defendant to leave the premises but that the defendant was being aggressive and "chesting up." She said that after "two or three" chest bumps, "I guess my husband had enough of it and hit him two to three times and he crawled or got on the ground and then my husband proceeded to kick him a few times." After he got up, the defendant went back in her husband's face and

He was at that time in [sic] very emotional, freaking out, I say crying, and saying, "Yeah, okay, I did it, but it was an accident." My husband confronted him about what [L.C.] had told us and of course he tried to deny it and all this, and then I guess he broke down after that and said, "Okay, okay, I did it. I did it but it was an accident. . . . I need help, I need to just kill myself. I would be better off. Everybody would be better off with me not around. I'm just going to kill myself."

Ms. C. testified that the incident in the parking lot lasted a total of 15 to 20 minutes. She said that later that evening the defendant made a cellular telephone call to her. She did not see the incoming call at the time but later noticed she had a message. She testified she had no doubt in her mind the defendant left the voice mail message. The following message was then played for the jury:

Hey, ah, you all ain't gotta call the law on me. I mean, I don't know, I'm just telling you, man. I told you everything that happened. You ain't gotta call the law on me. Just hell, man, disown me or something, you ain't gotta call the law.

Jeremy C., L.C.'s father, testified that prior to the incident he considered the defendant "more like a brother." They spoke during their confrontation in the Bradley Place Apartments parking lot, and Mr. C. told the defendant he knew why he needed to leave the scene. "[The defendant] denied knowing what I was talking about, and I asked him if he had made any secrets lately. And at that point he kind of became a little upset." Mr. C. testified that after their physical confrontation, he asked the defendant if what L.C. said was true, and he admitted it. Mr. C. testified that the defendant's tone then changed, he was no longer aggressive, and he began crying. The defendant said he did not want people thinking of him as a child molester.

On cross-examination, Mr. C. stated that the defendant said "he was asleep or was sleeping and was dreaming about his wife I think is what he said about it."

Detective Shaunda Efaw testified that she had been employed by the Bradley County Sheriff's Office for 14 1/2 years and had been a detective for eight and one-half years working child sex abuse cases. She was assigned L.C.'s case and interviewed the defendant on August 29, 2006. The interview was videotaped and entered into evidence. On the video, the defendant stated that L.C. had previously stayed over at their house because her parents would drink at his residence, and "I told them I didn't want her riding off with them." He admitted he had been drinking the evening of the offense but told Ms. Efaw there was no possibility he ever accidentally touched the victim as a result of drinking, stating, "Nah, nah, I don't get drunk. I just, I drink, I don't get drunk." The defendant said that the only way anything could ever have happened involving him and the victim was if the touching occurred while he was asleep when he knew nothing about it. He suggested that perhaps someone else touched the victim or that the victim's father touched her previously. Later,

the defendant mentioned that the victim had been upset with him earlier when he forbade her to smoke one of his cigarettes.

Upon further questioning, the defendant stated that he was having a dream about his wife, then he woke up and left the bed to return to the couch. "I just woke up, (inaudible), I was touching her down there, I was touching her down there and so I got up and went to the couch." The defendant then began to cry and stated:

> Here, you going to take me with you now? You've done talked me into saying it. I didn't mean to do nothing. They are my girls. I treat them all like mine, you know. I'm sorry, but I tell you, but I don't think it would help I'm thinking with my arm around my wife, you know, and there just ain't nothing happened. Can I go home or am I going with you all or what? I just don't want to talk about this no more, you got the truth, and there just ain't nothing. Just like [they] tell me that I need help – no, I don't need help, you know.

On cross-examination, Ms. Efaw testified that she never interviewed the victim or examined the bedroom where the incident allegedly took place. She took statements from the witnesses of the parking lot fistfight, videotaped the statement from the defendant, and watched the interview of the victim. Ms. Efaw testified that in her opinion, the defendant's voice mail message was "an admission of some sort."

Beverly Cash, the defendant's wife, testified that on the night of the incident, L.C.'s parents came to the Cash home and drank with the defendant.

> [T]hey had been drinking, and my husband drank with them, and after about 30 or 45 minutes that they had been there they said, "Well, we are going to the liquor store." Well, I said, you know, "You all have been drinking so let the kids stay here and play because they have been, you know, playing, just not very long." And they said yes.

This was around 9:30 or 10:00 p.m., and by that time, the defendant had passed out on the couch. She testified that they each drank a couple of shots of liquor and several beers. Around midnight she realized that L.C.'s parents had not returned. "I still sat in the living room and I heard my little daughter cry." Ms. Cash said she was on the couch with her husband, and the children were in the bedroom so they could watch television and fall asleep.

Ms. Cash testified that she tried to wake the defendant so he could take care of their crying daughter, who was sharing the bed with L.C. She had to shake the defendant and grab his hand to wake him up, but he eventually stumbled into the bedroom. Ms. Cash heard him stumble to the bathroom 15 to 20 minutes later, but he did not come back. After "maybe 10 or 15 minutes" she went to the bedroom, where she found him sleeping crossways on the bed. She tried to wake

-4-

him and get him to sleep with her because she could not sleep without him, but he would not leave and kept calling the name of their daughter and reaching out for her. Ms. Cash then went back to the living room. She testified that when he finally returned to the couch, he told her "I thought you were in bed with me, I thought we were going to bed together." She testified that he appeared angry.

On cross-examination, Ms. Cash stated that she did not think the defendant was too drunk to get up and tend to their ill daughter.

The defendant testified:

> . . . I fell asleep, I woke up, my hand was where it shouldn't be, I jump up, I run in the living room. I'm hysterical, I'm embarrassed, I'm ashamed, and I look at my wife and I get on to her, and everything settled down I guess and I went back to bed. I woke up the next day, I went to work. . . .
>
> I was just having dream. I don't know what it was, I've had them before, and I've just never been in a situation before where I've got kids beside me, but I have before and I was having a dream.

The defendant denied any intent to receive sexual gratification from a child. He stated that although he did not recall saying anything to L.C. as she alleged in her testimony, he admitted, "I guess it's possible."

On cross-examination, the defendant stated, "I believe it's a case of being an accident because I've drank for, I've probably drank since I was 18 and I ain't never had nothing like this happen." He stated that he repeatedly denied the incident to people because it was "inhumane" and shameful, and he was scared to lose his family over an accident. He testified that his wife was five feet, four or five inches tall, weighed 125 pounds, and definitely had a frame that could not be mistaken for a child. He repeatedly denied kissing L.C. on the neck.

The jury found the defendant guilty, and he filed a timely appeal. He claims that there was insufficient evidence to support the finding that his conduct was intentional. Specifically, he alleges that his conduct was the result of intoxication and mistake of fact.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003).

-5-

Moreover, a criminal offense may be established exclusively by circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); *Winters*, 137 S.W.3d at 654; however, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987) (quoting *Crawford*, 470 S.W.2d at 613).

Of critical importance in the present case, this court, in determining the sufficiency of the evidence, should not reweigh or reevaluate the evidence, *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990), and questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not the appellate court, *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Also, this court may not substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

As it pertains to the present case, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . . [when the] victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4) (2003).

> "Sexual contact" includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

*Id.* at 39-13-501(6). Intimate parts include, "the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id*. at § 39-13-501(2).

The defendant alleges that any touching of the victim was not "intentional" but instead was the result of a mistake of fact in light of his intoxication. Taken in the light most favorable to the State, the evidence reasonably supports a conclusion that the defendant intentionally touched the clothing covering the immediate area of the victim's genitalia. The offense occurred as part of multiple visits to the bedroom by the defendant. The defendant's wife testified that he knew what he was doing when he left the couch to go into the bedroom. At times, the defendant blamed alcohol, but in his video statement, he denied getting drunk. The defendant's voice mail message to the victim's parents, as well as his statements made in the parking lot confrontation, could be interpreted as admissions of guilt. In addition to this evidence, the victim's testimony that the

defendant asked her if she wanted him to touch her, that he kissed her neck, and that he asked her to keep it a secret all suggest intentional conduct. We find that a jury could reasonably conclude from the evidence that the defendant intentionally touched the victim's clothing covering the immediate area of the victim's genital area for the purpose of sexual arousal or gratification. *See State v. Hayes*, 899 S.W.2d 175, 180 (Tenn. Crim. App. 1995) (noting that intent in sexual battery cases is often proved by circumstantial evidence, including conditions under which the touching occurred); *see also State v. Meeks*, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993) ("We recognize that jurors may use their common knowledge and experience in making reasonable inferences from evidence."). Finally, we note that the statute only requires an intentional touching that can be "*reasonably construed* as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6) (emphasis added); *see also State v. Roy Chisenhall*, No. M2003-00956-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, June 3, 2004).

The judgment of the trial court is, therefore, affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE